OPINION OF THE COURT
Budd G. Goodman, J.
The defendant, charged in the instant indictment with crimi *113 nal possession of a weapon in the third degree (Penal Law § 265.02 [4]) and criminal possession of a controlled substance in the seventh degree (Penal Law § 220.03), moves to suppress a gun, ammunition and narcotics recovered by the police on the ground that such evidence was illegally seized.
A Mapp hearing was held before this court on April 19, 2000. After completion of the hearing, the court reserved decision on the defendant’s motion, pending submission by the People and the defendant of memoranda of law regarding the legality of the seizure.
The People called two witnesses at the hearing, Sergeant John Moran and Police Officer Anderson Walcott of the New York City Police Department. The defendant called no witnesses at the hearing. I generally credit the officers’ testimony, except as indicated herein, and their testimony forms the basis for the court’s findings of fact below.
Findings of Fact
On the night of September 14, 1999, Sergeant Moran and Officer Joseph English (Officer English did not testify at the Mapp hearing) were driving in a marked police van with Police Officer Walcott.[1] The three officers were in uniform. While the van was heading eastbound on 148th Street towards Amsterdam Avenue, Sergeant Moran observed a livery cab in front of them.[2] As the livery cab was stopped at a traffic light in the left lane at 149th Street and Amsterdam Avenue, the officers pulled up next to it. The rear window of the cab was positioned one half to three quarters of the way down and the defendant was seated next to that window. Sergeant Moran observed the defendant make eye contact with him and then make several quick unidentified “motions” and slouch down in his seat, while *114 at the same time rolling up the window. Officer Walcott observed the same behavior, except that he did not notice any “motions” by the defendant. Upon making eye contact with the officers, the defendant’s eyes opened widely. The officers could discern that there were three passengers in the livery cab (including the defendant), one of whom was seated in the front passenger seat. They observed that the defendant was seated in the back seat, that he was a black male and that a black male was also seated in the front passenger seat. The officers, however, could not determine the race or sex of the third passenger in the back seat. After the light changed, the livery cab started to drive away. Using the police van’s turret lights and siren, the cab was stopped and pulled over on the sergeant’s order. Sergeant Moran testified that he stopped the cab as it was proceeding down the street, because he “decided there might be a safety issue for the driver and [he] wanted to inquire to the driver if he felt okay and if everything was alright.” The sergeant stated that he was concerned for the driver’s safety because of a pattern of four prior livery cab robberies in nearby precincts, the most recent of which occurred about a month earlier. The sergeant further stated that the suspects in those robberies were three people, a female black and two male blacks. In addition, the sergeant testified that he was also aware of an incident that had occurred a few days earlier within the 30th Precinct, in which a medallion cab driver had been shot, with similar suspects. Apart, however, from describing the races and sexes of the suspects in these other crimes, no specific details of these suspects’ descriptions were presented at the hearing. In addition, Sergeant Moran testified that apart from the foregoing, the cab was stopped because it was operating in violation of a rule of the New York City Taxi and Limousine Commission (TLC), which prohibits a passenger from sitting in the front passenger seat of a livery cab next to the driver. No testimony was adduced at the hearing that the driver had sent a distress signal or otherwise indicated in any manner prior to the stop that there was anything wrong, nor was there evidence of any other alleged traffic infraction or violation being observed by the officers prior to the stop.
Upon stopping the cab, the three officers approached the vehicle without their guns drawn. Sergeant Moran knocked on the front passenger door with his radio. When that passenger’s window was not promptly rolled down, the sergeant opened the *115 door.[3] At this point, the rear door swung open and Police Officer Walcott began struggling with the defendant, whom the officer had observed raising a gun from underneath a jacket that the defendant had on his lap. Officer Walcott stated that a gun was present and Sergeant Moran assisted Officer Walcott in subduing the defendant. The defendant was removed from the vehicle, arrested and transported to the 30th Precinct, where a full search was done which produced two glassine envelopes of cocaine.
Sergeant Moran’s testimony that he was primarily concerned for the driver’s safety is belied by the fact that upon approaching the cab he immediately proceeded to knock on the front passenger door with his radio. Although Officer Walcott testified that Police Officer English went to the driver’s side of the cab and spoke to the driver, no testimony was adduced at the hearing concerning any inquiry that the officers made of the driver, despite the primary reason for the stop purportedly being to make certain that the driver was not in danger. From the testimony adduced at the hearing, the officers’ interaction with the livery cab after it was stopped was focused almost solely on the passengers, not the driver.
Conclusions of Law
Initially, the court notes that the defendant has standing to contest the stop by the police of the livery cab in which he was a passenger. (People v Millan, 69 NY2d 514, 520; People v Knight, 138 AD2d 294, 296.)
On a motion to suppress tangible property, the People bear the initial burden of going forward to establish the legality of the police conduct. (People v Wise, 46 NY2d 321, 329; People v Sanchez, 236 AD2d 243.) Once the People have satisfied their burden, the burden then shifts to the defendant to establish the illegality of the police conduct by a preponderance of the evidence. (People v Berrios, 28 NY2d 361; Matter of Muhammad F., 255 AD2d 168.) A traffic stop of a vehicle by a police officer constitutes a seizure. (People v Boswell, 94 NY2d 136; People v Banks, 85 NY2d 558, 562; People v May, 81 NY2d 725, 727; People v Sobotker, 43 NY2d 559.) For a traffic stop to pass constitutional muster, the police action in stopping the vehicle must be valid in its inception. (People v Banks, supra.) In order *116 to stop a moving vehicle[4] to investigate criminal activity, a police officer must possess a reasonable suspicion[5] that the occupants of the vehicle have been, are presently, or are about to engage in criminal conduct. (People v Sobotker, supra; People v John BB., 56 NY2d 482.) Hunches and “gut feelings” alone do not constitute sufficient reasonable cause to justify the stop of a vehicle and the seizure of its occupants. (People v Sobotker, supra, at 564.) Without reasonable suspicion, such a stop constitutes an illegal seizure of the vehicle’s occupants and any evidence seized as a result of the stop must be suppressed. (People v Sobotker, supra; Wong Sun v United States, 371 US 471; People v Peterson, 266 AD2d 738; People v Letts, 180 AD2d 931, 933.)
It is well settled that a police officer may stop a vehicle if he reasonably suspects that a violation of the Vehicle and Traffic Law has occurred, or when some objective evidence of criminal activity has been observed.[6] (People v Ingle, 36 NY2d 413; People v Sobotker, supra.) In addition, a police officer can effect a legal stop of a vehicle based solely upon an Administrative Code of the City of New York violation, rather than a violation of the Vehicle and Traffic Law. (See, People v Hutchinson, 60 AD2d 557, 558; People v Cedeno, NYLJ, Jan. 4, 1996, at 25, col 5.) Generally, however, conduct which is otherwise susceptible to innocent interpretation is insufficient to justify the forcible stop of a vehicle. (People v De Bour, 40 NY2d 210, 216; People v Peterson, supra.)
The bases for the stop adduced at the hearing were a combination of (i) the cab operating in violation of a TLC regulation which prohibits a passenger to ride in the front seat of a livery cab, (ii) the defendant’s eyes opening widely when he first saw the police pull up next to the cab and his then slumping down in his seat and closing the window next to his *117 seat, and (iii) several previous cab robberies and a shooting had occurred in the area. The court finds that based upon the testimony adduced at the hearing the People have failed to meet their initial burden of establishing the legality of the police conduct. The facts of the case at bar presented at the hearing fail to demonstrate the requisite reasonable suspicion to justify the initial stop of the cab. The court will address each of the foregoing bases separately.
Violation of TLC Regulation Forming Basis for Stop:
Sergeant Moran testified that the primary reason for the cab stop was to see if the driver was in danger since he observed a passenger sitting next to the driver in the front passenger seat. The sergeant further testified that TLC rules prohibit a livery cab passenger from sitting in the front of the cab and that the cab was stopped partially based upon this purported violation. The People have not provided any legal basis to substantiate the sergeant’s belief that the seating arrangement in the cab at the time of the defendant’s arrest violated any rule, regulation or law. As far as this court can determine, there exists no rule or regulation of the TLC that prohibits a passenger from sitting in the front passenger seat of a livery cab. On the contrary, the TLC rules and regulations specifically provide that “[a] driver shall permit a passenger who is unable to enter or ride in the rear passenger part of the vehicle, to occupy the front seat alongside the driver.” (35 RCNY 6-16 [m] [emphasis added].) Therefore, despite the sergeant’s belief that a violation had occurred that justified a stop of the vehicle, the court finds that no such predicate in fact existed and his testimony cannot be credited. (See, People v Perez, 149 AD2d 344, 345 [without traffic infraction no reasonable basis existed to stop vehicle]; People v Yard, 147 Misc 2d 609 [no reasonable basis to stop vehicle existed where police acted on mistaken belief that passing on right side was prohibited in all instances, where law permitted such conduct under certain conditions which the defendant had met].)
Conduct of the Defendant:
The police also based the stop of the vehicle on the conduct of the defendant when he observed the police van pull up alongside the cab. The police officers testified that when the defendant saw them that his eyes opened widely and that he slouched down in his seat, while closing the window quickly. This behavior, however, is innocuous and subject to innocent *118 interpretation, and without more, is insufficient to support a finding of reasonable cause to justify the stop of the vehicle. (People v De Bour, supra; People v Concepcion, 216 AD2d 141 [observation by police of defendant “ ‘fidgeting around,’ ” looking away and raising one of his hands, did not constitute reasonable cause to stop the cab, even though officers were aware that a livery cab robbery had taken place that night in nearby precinct]; People v Bu Chann, 221 AD2d 155 [conduct in looking away and slumping down did not suggest criminal activity was afoot]; People v Caceares, NYLJ, Oct. 20, 1995, at 28, col 5 [widening of eyes and slouching down upon first sight of police did not justify stop]; People v Mestey, 61 AD2d 447 [taxi passenger’s sudden downward motion did not provide reasonable cause for stop]; People v Rosario, NYLJ, May 17, 1994, at 24, col 1 [taxi passenger’s slumping down after making eye contact with police officer, when police pulled up next to taxi at stop light, did not create reasonable cause to stop the taxi]; Matter of Akeem L., 174 AD2d 437 [sliding down on back seat of taxi and covering face with hands did not create reasonable suspicion of criminal activity]; People v Rossetti, 148 AD2d 357 [looking over shoulder and ducking down were innocuous actions which did not generate reasonable cause]; People v Herrera, NYLJ, Oct. 5, 1999, at 33, col 5 [action of livery passenger in leaning forward and other passengers looking around were innocuous and did not constitute reasonable suspicion, even though robberies had recently occurred in the same area; description of suspects too general].) In addition, although Sergeant Moran testified that his primary concern was the livery driver’s safety, the court notes that the hearing testimony belies such, since it failed to demonstrate any meaningful inquiry by the police of the driver regarding his safety, the police officers’ attention apparently being focused primarily on the passengers from the moment they approached the livery cab. (See, People v Rosario, supra.) Moreover, no distress signal of any type was observed by the police prior to the stop (a circumstance that would have provided reasonable cause for the stop). (See, People v Rivas, 265 AD2d 235; People v Blakely, 46 NY2d 1026; People v Otero, 255 AD2d 158; People v Hampton, 197 AD2d 365; People v Caceares, supra.)
The cases cited by the People in support of the stop are distinguishable. In (i) People v Heron (185 AD2d 859), the defendant was observed leaning forward and putting his arm over the driver’s seat, providing the police with reasonable cause to conclude that a robbery was in progress; (ii) People v Rivas *119 (supra), the taxi was observed flashing its high beams and weaving from one lane to another, which gave the police the authority to stop the cab; (iii) People v Worthy (261 AD2d 277), the vehicle stopped was missing a front license plate, justifying the initial stop (see also, People v Brown, 215 AD2d 771); (iv) People v Damaceno (214 AD2d 464), the taxi was observed by the police operating with its headlights off; (v) People v Fernandez (261 AD2d 178), there was no vehicle stop and there was the added element of the police arriving to investigate a telephoned report of a robbery in progress and then observing the defendant in close proximity acting in a furtive and nervous manner; (vi) People v Valentine (253 AD2d 680), the police observed a struggle in the front seat with one person sitting there having a hat pulled down over his face; (vii) People v Brantley (235 AD2d 546), the police observed “violent” hand and upper body movements as if an altercation were occurring; (viii) People v Ferguson (249 AD2d 168), the cab was being driven erratically through traffic at high speed through double-parked cars; and (ix) People v Otero (255 AD2d 158, supra) and People v Rodriguez (265 AD2d 181), the police observed a distress signal from the cab driver which justified the stops.
Accordingly, the defendant’s innocuous behavior, without any sign of distress from the driver, was insufficient to justify the stop of the cab by the police.
Prior Robberies as Basis for Stop:
Sergeant Moran testified at the hearing that he was concerned for the driver’s safety not only because of the defendant’s conduct, but because he was aware that (i) there had been four robberies of livery cabs in the general vicinity, and (ii) a yellow medallion cab driver had been shot in the 30th Precinct three days earlier. However, the evidence adduced at the hearing revealed that the last of the four robberies occurred approximately one month prior to the arrest in the instant case, that the closest robbery occurred approximately 20 blocks away from the spot where the defendant was arrested and that all of the robberies occurred between midnight and 4:45 a.m., while the instant incident occurred at 8:25 p.m. Sergeant Moran testified that the only description of the perpetrators in these robberies (obtained from a “pattern sheet”) was two black males and a black female. With respect to the shooting, Sergeant Moran testified that the driver of the medallion cab was shot at 3:30 a.m. and that the perpetrators in that case were allegedly a black male, a black female and either an Hispanic or black *120 male. Testimony at the hearing revealed that while Sergeant Moran could see that the defendant was a black male, he could not determine either the race or sex of the other person seated in the back seat of the taxi and could only determine that the person seated in the front seat was either black or Hispanic, but could not determine that person’s sex. Therefore, since the sergeant did not even know if a female was present in the cab, he certainly could not make a reasonable conclusion that the passengers in the instance case fit the very general description of the suspects in the prior robbery and shooting incidents, which included a female.
Moreover, Sergeant Moran’s knowledge of the descriptions of the perpetrators of these other crimes was so generic as to render such meaningless. Thus, it could not form a basis for the stop of the livery cab in the case at bar. In the recent case of Matter of Rubin M. (271 AD2d 291), the Appellate Division, First Department, suppressed a gun recovered, where the defendant was stopped on the street because he fit a description in a “Rape Hot Sheet” which was vague and generic and could be applied to countless New Yorkers (the defendant was stopped in the same precinct where the rape and robbery incidents had occurred). Unlike the description provided in Rubin M. (which at least provided a range of age, height and weight), the description in the case at bar was even more generic, only describing the perpetrators as two black males and a black female (with regard to the robberies) and a black male, a black or Hispanic male and a black female (with regard to the shooting). This is insufficient, especially given the fact that no female was observed in the cab in the instant case. (See, People v Hernandez, 180 AD2d 555; People v Herrera, supra.) Moreover, as in Rubin M., the description which Sergeant Moran possessed would apply to countless law-abiding members of the community who use livery cabs in Manhattan, especially in the early evening hours.
Therefore, the stop of the livery cab by the police cannot be justified on these grounds. (Matter of Rubin M., supra; People v Ferrance, 247 AD2d 204; People v Salvaty, 163 AD2d 494; People v Herrera, supra; see also, People v Boswell, 94 NY2d 136, supra.)
Conclusion
For the reasons stated herein, the court finds that none of the bases relied upon by the People constitutes a reasonable *121 basis to justify the initial stop of the livery cab and the seizure of its occupants. Accordingly, the initial stop by the police of the livery cab in which the defendant was a passenger was illegal and the defendant’s motion to suppress all evidence that flowed from such illegal seizure, to wit, a gun, ammunition and cocaine, is hereby granted. (People v Sobotker, 43 NY2d 559, supra; Wong Sun v United States, 371 US 471, supra; People v Peterson, 266 AD2d 738, supra; People v Letts, 180 AD2d 931, supra.) Since the court has determined that the initial stop was illegal and that all evidence that flowed from it must be suppressed, the court will not examine the interactions between the police and the defendant subsequent to the stop.

. Officer Walcott had been assigned elsewhere that evening and was being given a ride back to the station house.

. At the time of the incident, Sergeant Moran was a 12-year veteran of the New York City Police Department. Sergeant Moran is currently assigned to the Narcotics Bureau in the South Bronx and has been assigned there for approximately three and one-half months. Prior to that, Sergeant Moran spent approximately two and one-half years as a supervisor in the 30th Precinct’s “Tracer Unit,” which he stated is a hybrid between narcotics and patrol. Prior to that assignment he spent two years as a narcotics investigator and prior to that he was assigned to the Taxi and Livery Task Force for approximately two years. Officer Walcott, a four and one-half-year veteran of the police force, was assigned to the Street Crimes Bureau at the time of the defendant’s arrest. Prior to that, he had been assigned to the 30th Precinct’s “Tracer Unit” for approximately two years.

. The sergeant testified that due to the tint of the cab’s windows, he was unable to see through the window and was concerned for his safety.

. The right to stop a moving vehicle must be distinguished from the right of the police to approach a stationary or parked vehicle. (See, People v Ocasio, 85 NY2d 982; see also, Kamins, New York Search & Seizure, at 338-341 [2000 ed].)

. “Reasonable suspicion” has been defined as “the quantum of knowledge sufficient to induce an ordinarily prudent and cautious man under the circumstances to believe criminal activity is at hand.” (People v Cantor, 36 NY2d 106, 112-113.)

. Thus, it has been held that a police officer possesses reasonable suspicion of criminal activity and may effectuate a vehicle stop when a taxicab is using high beams or no lights (since such may be distress signals being sent by the driver indicating criminal activity) or when the police observe some damage to a vehicle. (See, Kamins, New York Search & Seizure, at 344-345 [2000 ed].)