OPINION OF THE COURT
Kathleen M. Rogers, J.
Defendants are charged with acting in concert in the criminal possession of marijuana in the first degree (Penal Law §§ 20.00, 221.30) on January 18, 2012 in the Town of Gouverneur. Pursuant to a stipulation of counsel, approved by the court (Richards, J.) on August 27, 2012, the court conducted a suppression hearing to inquire into the probable cause for the stop of the defendants by Border Patrol agents, and the resulting seizure of approximately 23 pounds of marijuana. I conducted that hearing on March 5, 2013, and now make the following findings of fact and conclusions of law.
Findings of Fact
Brandon Carrier was the only witness to testify. He stated that he was employed as a Border Patrol agent on January 18, 2012 and was on duty around 8:00 p.m. that evening in a marked patrol car. He had a partner with him in the car. They were parked in Dekalb Junction in St. Lawrence County on US Route 11. They were parked in such a way that their lights *679 were shining across the road to observe drivers and cars as they went past.
Agent Carrier testified that a white SUV drove by slowly. He believed this was slower than some of the other vehicles in that area. The driver had both hands on the steering wheel and was pushed back in the seat, obstructing his view. He stated his opinion that most drivers had either one hand on the wheel or appeared more relaxed if they had two hands on the wheel.
At this point he pulled out to follow the vehicle and caught up behind her in his marked car close enough to read the license plate. This was in a rural area which was dark. He indicated that he had accelerated to come up behind the vehicle. As he was approaching the SUV he noted that it swerved once distinctly to the left and then corrected. On cross-examination, he admitted he could not recall whether it had been left, then right, or right, then left. It did not cross any lines in the road.
He then ran a radio check to determine whether or not the car was stolen. Agent Carrier testified that he was informed that the vehicle was registered to Corene Deer and that the address given for the person registering the vehicle was Rooseveltown. He acknowledged after several questions on cross-examination that he was aware that some of Rooseveltown was on the Akwesasne Mohawk Reservation and that Deer was a common Mohawk name. He was also advised in the radio run that Corene Deer was a known smuggler. There was no proof regarding the source of the statement in the radio run.
Agent Carrier said that he continued to follow the SUV and noticed that it went between 50 and 60 miles per hour. When the two vehicles came up behind another vehicle, which was moving slowly, the SUV slowed down, drove behind it and did not pass. The SUV followed at 35 miles per hour and when the road split into two lanes, the SUV and the third vehicle went to the right to the slow lane to permit the Border Patrol vehicle to pass. Agent Carrier stated he passed the two vehicles and proceeded into the Village of Gouverneur, where he parked in a well lit parking lot facing oncoming traffic. This permitted him to direct his headlights directly into oncoming vehicles.
He observed an elderly person in the slow-moving vehicle enter the village and the SUV enter behind it, having not passed. He observed a driver and passenger in the SUV He testified that they stared straight ahead as they passed him and did not look at him. At this point in the narration in his direct testimony, he stated that he saw no registration sticker on the *680 front windshield of the vehicle. He continued with his testimony by stating that he drew up beside the SUV as it drove through Gouverneur and the two persons in the SUV looked away from him. This would have been toward the stores and restaurants in that village. The two women in the car did not look at the two males who had driven up next to them at night and stared at them. He observed they were speaking at the time.
After the two cars left Gouverneur, Agent Carrier activated his lights and stopped the SUV He approached the driver’s side of the vehicle and observed the driver was holding the registration, the sticker and her license. The driver stated, “I just want to go home and see my baby.” Counsel stipulated that if Agent Carrier’s partner had been called he would testify that he could not recall seeing whether or not the registration sticker was on the window before the stop.
On direct examination, Agent Carrier indicated that he had concerns regarding Akwesasne because it was on the border and parts were in Canada and parts were in the United States. He stated that Route 11 was a corridor for smuggling contraband and people.* He indicated there were roads that lead from Canada to the United States on Akwesasne that do not require border stops. On cross-examination, Officer Carrier testified that Akwesasne was an area with a “heightened amount of smuggling action” but denied that gave him a “heightened concern” in dealing with people from Akwesasne. After some questions he said it was a consideration he weighed in deciding to stop the vehicle. When he saw Corene Deer sitting in the car, he testified he knew from looking at her that she had physical attributes consistent with someone who was Mohawk.
On cross-examination, the officer testified that he filed a report, known as an 144, at the time of the incident on January 18, 2012 which was required to be accurate and complete as to important matters. There was a process to amend or change this report, but he did not amend or change the 144 he filed in *681 this matter. He acknowledged that there was no mention whatsoever of the registration sticker in his report. He said he did not stop the vehicle because there was no sticker on the windshield and that this had nothing to do with the stop.
Officer Carrier on cross-examination said the reasons he stopped the vehicle were that the driver had both hands on the wheel with her arms extended, that she sat pushed back in the seat, that she swerved once in the lane during six miles of following her (at times close enough to read her license plate in an unlighted area) and that she did not pass a slow-moving vehicle when, in his opinion, she might have. He acknowledged the driver broke no other vehicle and traffic laws other than apparently speeding up to 60 miles per hour at times. He observed and followed her for between 15 and 20 minutes. She did not try to evade or flee.
The only objective criteria upon which Agent Carrier asked for a radio run was the driver going by sitting back in the seat with her arms straight out. He agreed there was no observable problem with the vehicle such as a light out. He acknowledged that there was nothing unique about the area of Dekalb Junction itself with regard to smuggling other than the fact that the main route passing through was Route 11.
The court believes that Officer Carrier decided to follow the white SUV and do a radio run because the driver appeared nervous. Her actions were completely consistent with a person who was not engaged in any criminal activity. There was no basis to believe that a vehicle with a New York State license plate and registration had crossed the border or was engaged in any way with smuggling persons or contraband across the border. He drove up behind the SUV( coming close enough on a dark night in a rural area to see her license plate. As he overtook her or followed her, she swerved, a not unexpected result of having someone come up quickly, not pass and start to follow you. The radio run advised him that the person who owned and registered the vehicle lived at an address on or near the Mohawk reservation and had a name that might be consistent with a person of Mohawk heritage. It could, of course, also be a husband’s name and not her own. The officer then drove into Gouverneur, not for the purpose of stopping the vehicle immediately, but to further observe it, according to his testimony. He placed himself in a position to see into the vehicle with streetlights, parking lot lights and his headlights. He had the opportunity at that point to observe Corene Deer with her clearly Native American *682 features. He then stopped the vehicle. He was handed the registration sticker which should have been on the windshield. He wrote his report without even mentioning it, clearly indicating to the court that it was in no way the basis for his stop. Although he testified about observing that the sticker was not on the windshield at a point in his narrative of events that might have led the court to believe he observed it prior to the stop, his testimony on cross-examination made it clear that he did not observe it prior to the stop, nor was it the basis for the stop.
After the stop, Agent Carrier asked the women for identification while he stood on the driver’s side and his partner stood behind the vehicle. Each produced a New York State driver’s license. He asked where they were from. Rachel Morgan, the driver, said she was from Cortland and Corene Deer said she was from this area. Both stated they were citizens. Corene Deer told him they were headed for Buffalo, New York. He testified that one said they were going to Tonawanda which is also in the Buffalo area. Ms. Morgan indicated she was going to Cortland, which is not close to Buffalo. The attorneys stipulated that Agent Carrier’s partner would have testified that defendants gave him an answer which was different from the one they gave Agent Carrier. Agent Carrier indicated he was told the answer was Batavia, which is approximately 40 miles east of Buffalo. Agent Carrier did not testify to having asked any further questions to clarify these answers.
Agent Carrier called for the New York State Police to assist and an officer arrived. He also ran their licenses. Ms. Morgan did not have a valid license. The New York State trooper asked why Ms. Deer was not driving and she said she had consumed alcohol. According to the testimony, the trooper gave her an Aleo-Sensor test. Agent Carrier said the test was negative for under the influence. He did not say it proved that she had not been consuming alcohol.
Agent Carrier called for a canine agent and within one hour, the trooper and his canine were on the scene. Ms. Morgan and Ms. Deer were asked to exit the vehicle with the small dog traveling with them and they stood near or sat in one of the vehicles. They were asked to step away for their safety because of the drug dog. They were not locked in any vehicle.
The dog reacted to drugs and the trooper told Agent Carrier to check the spare tire in the back. He tried to let the air out and none came out. He cut the tire and said he saw a green leafy substance. At that time, both subjects were placed under arrest.
*683 Conclusions of Law
The facts developed at the hearing make clear that Agent Carrier’s stop of defendants was not based on a traffic violation. It was an investigative stop. Carrier and his partner were on roving patrol on a major US highway. The stop must be analyzed both as an investigative stop and as a roving patrol stop.
“[A]n officer may stop a vehicle to investigate criminal activity when he has a reasonable suspicion that its occupants have been engaged, are presently engaged, or are about to engage in conduct in violation of the law.” (1-5 Kamins, New York Search & Seizure § 5.02 [3] [a] [emphasis omitted]; see People v May, 81 NY2d 725 [1992]; People v Sobotker, 43 NY2d 559 [1978]; People v Figueroa, 38 AD3d 796 [2d Dept 2007].) Absent reasonable suspicion, the stop is an impermissible seizure of the vehicle’s occupants, and any evidence seized as a result must be suppressed. (1-5 Kamins, New York Search & Seizure § 5.02 [3] [a].)
An officer’s hunch about a car, without more, will not justify a reasonable suspicion of criminal activity. (People v Gutierrez, 8 Misc 3d 1012[A], 2005 NY Slip Op 51063[U] [Nassau Dist Ct 2005]; People v Perez-Lopez, 29 Misc 3d 1218[A], 2010 NY Slip Op 51873[U] [Sup Ct, Bronx County 2010]; Kamins, op. cit. § 5.02 [3] [b] [i].)
An officer also may not stop a vehicle because of the occupants’ ethnic identity (People v La Borde, 66 AD2d 803 [2d Dept 1978]), or because he believes that the occupants are “up to no good.” (Kamins § 5.02 [3] [b] [ii]; see People v Dugan, 222 AD2d 770 [3d Dept 1995]; see also People v Stock, 57 AD3d 1424 [4th Dept 2008]; People v Morrison, 161 AD2d 608 [2d Dept 1990].) In United States v Montero-Camargo (208 F3d 1122 [9th Cir 2000]), cited by defense counsel, the court held that Hispanic appearance was, in general, of such little probative value that it may not be considered where particularized or individualized suspicion was required. (See also Farag v United States, 587 F Supp 2d 436 [ED NY 2008] [court rejected government’s contention that (plaintiffs’) Arab ethnicity could be a factor in determining the validity of (plaintiffs’) seizures and detentions].)
Police observations of behaviors which are innocuous in and of themselves do not cumulatively support a finding of reasonable suspicion. Examples include an occupant turning his head (People v Giles, 137 AD2d 1 [1st Dept 1988], revd on other grounds 73 NY2d 666 [1989]), reaching under a seat (People v *684 Mestey, 61 AD2d 447 [1st Dept 1978]; see generally People v Corcoran, 89 AD2d 696 [3d Dept 1982]), leaning into the front seat or looking back and forth (People v Herrera, NYLJ, Oct. 5, 1999 [Sup Ct, Queens County 1999]), or slouching down in the backseat (People v Thomas, 185 Misc 2d 112 [Sup Ct, NY County 2000]). (See 1-5 Kamins, New York Search & Seizure § 5.02 [3] [b] [iv].)
However, factors relevant to reasonable suspicion are not to be evaluated individually or in isolation from one another, but under a totality of circumstances analysis. Police officers are permitted to interpret the behavior of motorists in light of their training and experience, but innocuous behavior alone will not generate a reasonable suspicion that a crime is at hand. (People v Solano, 46 AD3d 1223, 1224-1225 [3d Dept 2007], lv denied 10 NY3d 817 [2008], citing People v De Bour, 40 NY2d 210, 216 [1976].)
A roving patrol stop occurs when a law enforcement officer stops a moving car on the highway. Such stops are seizures under the Fourth Amendment. (People v Scott, 63 NY2d 518 [1984]; 1-5 Kamins, New York Search & Seizure § 5.02 [4] [a].) Unlike investigative stops, roving patrol stops occur without individualized suspicion about the vehicle or its occupants. Because roving patrols involve so much police discretion with respect to a particular stop they are looked at with disfavor by both state and federal courts, and are generally authorized as a last resort under narrow circumstances. (Delaware v Prouse, 440 US 648 [1979]; United States v Martinez-Fuerte, 428 US 543 [1976]; United States v Brignoni-Ponce, 422 US 873 [1975].) Roving patrols usually occur without a systematic selection process for stopping vehicles and are therefore usually constitutionally suspect. (Matter of Muhammad F., 94 NY2d 136, 145-146 [1999].) As the Supreme Court stated in Brown v Texas (443 US 47, 52 [1979]), “[i]n the absence of any basis for suspecting appellant of misconduct, the balance between the public interest and appellant’s right to personal security and privacy tilts in favor of freedom from police interference.”
In People v Abad (98 NY2d 12, 16-17 [2002]), the New York Court of Appeals held that
“[a]utomobile stops, which constitute seizures for Fourth Amendment purposes, historically have been founded upon an officer’s reasonable suspicion of illegal activity (People v Sobotker, 43 NY2d 559 [1978]). Suspicionless stops, however, may be up *685 held where reasonable, determined by balancing ‘the public interest and the individual’s right to personal security free from arbitrary interference by law officers’ (Brown v Texas, 443 US 47, 50 [1979] [internal citations and quotation marks omitted]). For evaluating the validity of a particular stop, Brown offers a three-part balancing test: the gravity of the public concerns served by seizure of the vehicle, the degree to which the seizure advances the public interest and the severity of interference with individual liberty (id. at 50-51). That test has been applied by the Supreme Court and this Court to review suspicion-less automobile stops, including by roving patrols (Michigan Dept. of State Police v Sitz, 496 US 444 [1990]; Delaware v Prouse, 440 US 648 [1979]; United States v Brignoni-Ponce, 422 US 873 [1975]; Muhammad F., 94 NY2d 136; People v Spencer, 84 NY2d 749, cert denied 516 US 905 [1995]).”
The People have submitted the recent case of People v McLean (99 AD3d 1111 [3d Dept 2012]) as supporting claimed reasonableness of the stop in this case. The court finds that case inapposite since it was clearly predicated on a vehicle and traffic stop for erratic driving. Here the most that can be said in support of reasonable suspicion is that Agent Carrier thought it was odd or suspicious that the driver was holding the steering wheel with both hands and her arms extended, and that she slowed the car’s speed under circumstances which the officer found surprising. A vehicle stop must be valid at its inception: it cannot be bootstrapped into reasonable suspicion by mounting concerns over diverging explanations from the vehicle occupants as to their intended destination. Notwithstanding the radio information Carrier received from his check with the Swanton Sector control, he did not have particularized suspicion that this vehicle had violated the Vehicle and Traffic Law or that the occupants were engaged in a crime. This was mere speculation and guesswork on his part. His candid testimony that the occupants looked like Mohawks, that one had what Carrier believed is a Mohawk name, and that the car was listed for an address near the Mohawk Indian reservation bordered on improper racial profiling. The factors about which Carrier testified did not collectively, even under a totality of circumstances analysis, rise to the level of reasonable suspicion of criminal activity. Nor were those factors sufficient to meet the even more rigorous requirements for a permissible suspicionless patrol *686 stop because there was no testimony about established procedures for such stops or that such procedures were followed in this case.
For these reasons the motion to suppress the marijuana and any observations of Agent Carrier or his unidentified partner agent is granted, and such evidence may not be used at trial.

 The court takes judicial notice of the fact that US Route 11 is a major traffic artery connecting Watertown, Gouverneur, Canton, Potsdam, Malone and Plattsburgh, New York, with connections to other major highways linking Ogdenshurg and Massena and bridges to Canada. Testimony in many cases has established that while illegal drug traffic, not necessarily smuggled across the international border, often moves along that route, at least in part, it also frequently moves along other state highways and secondary roads. Moreover, it is self-evident from the nature of the highway and its location that the vast majority of the traffic which it carries has nothing to do with smuggling or drug traffic.